UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RALPH W. CLOSE and LAURA A. LARSON, individually and as the parents of decedent JAMES ROBERT CLOSE<br><br>Plaintiffs,<br><br>v.<br><br>PIERCE COUNTY, WASHINGTON; PIERCE COUNT SHERIFF PAUL PASTOR; EDWARD CORRELL; JOSEPH GORMAN; and TODD KLEMME,<br>Defendants. | Case No. CV-09 - 05023RBL<br><br>ORDER ON MOTIONS FOR SUMMARY JUDGMENT |

This matter is before the court on competing Motions for Summary Judgment on the Defendants' Qualified Immunity defense to the Plaintiffs' claims. The case involves the suicide of Plaintiffs' adult son, James Close, in the Pierce County jail. Plaintiffs seek a ruling that Defendant Correll and Defendant Gorman's asserted Qualified Immunity defense is not valid [Dkt. #31]. The individual Defendants have similarly moved for Summary Judgment, asking the court to determine as a matter of law that there was no Constitutional violation, and that qualified immunity protects them from plaintiffs' claims even if there was. Defendants Pierce County and its Sheriff, Paul Pastor, seek a ruling that they are not liable in any event, under

*Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018 (1978). [Dkt. #41]

Plaintiffs argue that the Ninth Circuit recognizes the liberty interest which is the focus of their claim, and alternatively seek[1] additional time for discovery, pursuant to Rule 56(f), on the County's and the Sheriff's *Monell* defense.

**A.  Factual Summary.**

Plaintiff Ralph Close (James' father) informed the FBI that his son had likely committed a bank robbery. On June 16, 2006, acting on this information, Pierce County Violent Crimes Task Force members arrived at James Close's residence in Sequim to serve and execute arrest and search warrants. According to Detective Karr (one of the officers on the scene) James Close was cooperative, and said he would confess, even before the officer had finished reading him his rights. After a taped interview at the local Washington State Patrol office, James Close was permitted to return to his home to say goodbye to his girlfriend, his father, and his dog. His girlfriend apparently told him at that time that his father had turned him in, and James became very angry. While the team executed the search warrant, Officer Karr sat in the car with James and made small talk. According to Karr, James did not seem suicidal, but was instead "pretty even keeled."

Nevertheless, Ralph Close had told the FBI that James had attempted suicide previously that year, that he was possibly bipolar and depressed, and was not taking any medication. Karr was aware of this information, and as a result made sure that the "booking form" for James included it. Karr also witnessed and acknowledged James' mood swings, and saw him smash a laptop. The Deputy who actually filled out the booking form wrote "SUICIDE WATCH" on the top of the form. Detective Parr then drove James Close to Pierce County. He observed Close as "up and down" and perhaps "a little loopy." Like Karr, he did not believe that James was then suicidal; he even had a meal with him prior to actually taking him to

---

[1] Plaintiffs also seek to strike the declarations of Snow, Stewart, and Zimmerman, arguing that they were not timely disclosed prior to the Defendants' Motion. The Motion to Strike is DENIED.

the jail.

At the jail, Parr pointed out the "suicide watch" notation to the booking officers. Those officers, Correll and Gorman, have submitted conflicting testimony about whether they saw the notation. Viewed in the light most favorable to the Plaintiffs (as it must be in connection with the Defendants' Motion), the evidence establishes that both officers saw and acknowledged the notation, and discussed it among themselves.

In any event, Gorman and Correll both had received mental health evaluation training, and both claim they evaluated Close and determined that he was not a suicide risk. Neither recommended a mental health evaluation by a doctor, and although they could have done so, neither placed James Close in a "suicide smock" or a suicide watch cell. Both officers admit that the print officer, Defendant Officer Klemme, also had mental health training, as well as the authority to put James Close in a smock. Officer Klemme acknowledges this. None of the officers did so, and less than two hours after being admitted to a regular cell, James Close hung himself. Despite the efforts of Officers on the scene, James Close died.

Plaintiffs' §1983 claim against these three officers is that their deliberate indifference deprived them of their 14th Amendment liberty interest in their relationship with their adult child. The viability of this claim is discussed below.

The Plaintiffs also allege that the County and the Sheriff are liable for the actions of the Officers, arguing that the deliberate indifference is a policy or practice of the Sheriff's Department. This claim is based in part on an Order entered by this Court more than 10 years ago, in a case known as *Herrera v Pierce County*, Cause No. 95-5025RJB-JKA. (*See* Ex. Z to Barone Dec; Dkt #61; *see also* Dkt. #89 in the *Herrera* case). That Stipulated Order required the County to improve the mental health care at its jail, and more than 13 years later the Order is still in effect.

**B.     Summary Judgment Standard**.

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

**C.    Qualified Immunity.**

The doctrine of qualified immunity shields executive officers from civil suit for conduct that "does not violate any clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity applies when the facts, taken in the light most favorable to the party asserting the injury, show either that the officer's conduct did not violate a constitutional right, or that a reasonable officer could think his conduct was lawful in the situation. *Saucier v. Katz*, 533 U.S. 194, 201, 202 (2001).

Qualified immunity shields law enforcement officers from liability for conduct that in fact violates a constitutional right, so long as a reasonable officer could think the conduct lawful: "qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz*, 533 U.S. at 206). "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or,

indeed, even the burdens of litigation." *Brosseau*, 543 U.S. at 198. In determining whether a right is clearly established, the level of abstraction at which the right is stated must be particularized to the case, and not as a broad proposition: "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 202.

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In analyzing a qualified immunity defense, the Court must determine first whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and then whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id*. The Supreme Court has recently held "that the *Saucier* protocol [determining whether a violation is present in the first instance] should not be mandatory in all cases . . .[but] it is often beneficial." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

The Defendants' Motion has two bases: the facts do not support a claim of deliberate indifference, and there is no clearly established Constitutionally protected right implicated by the suicide of an independent, adult child. The Court will therefore address the qualified immunity claim in the traditional, two step fashion.

**1.    The viability of Plaintiffs' Liberty Interest Deprivation Claim**.

The Plaintiffs' sole substantive claim is that the actions of the officers and the County deprived them of their Constitutionally-protected liberty interest in the life of their independent, adult son. Defendants argue that there is no such claim as a matter of law.

This position is based on the assertion that some other Circuits have rejected such a claim, relying

ORDER
Page - 5

on Supreme Court precedent which expressly recognized that there is a parental liberty interest in the companionship of a minor child. *See, e.g., Troxell v. Granville*, 30 U.S. 57, 65-66, 120 S. Ct. 2054 (2000) ("the liberty interest at issue in this case--the interest of parents in the care, custody, and control of their children--is perhaps the oldest of the fundamental liberty interests recognized by this Court").

Defendants reluctantly recognize that the Ninth Circuit has extended this protection to the companionship of an adult child. *See Kelson v. City of Springfield*, 767 F.2d 651 (9th Cir. 1985); *see also Rentz v. Spokane County*, 438 F.Supp.2d 1252, 1264 (E.D. Wash. 2006)("Based on current Ninth Circuit authority, [plaintiff parents] are entitled to assert Fourteenth Amendment substantive due process causes of action seeking to vindicate their constitutional rights for loss of companionship with their adult son.")

Nevertheless, because they claim that Ninth Circuit courts have recognized this claim "with reservations," this Court can and should rule that it does not exist as a matter of law. Defendants' position on this portion of their Motion is not well-founded. This Court cannot and will not overrule Ninth Circuit precedent on this point. The Plaintiffs' 14th Amendment claim will not be dismissed on the basis that this Circuit should not recognize it.

**2. The evidence supporting Plaintiffs' Deliberate Indifference Claim.**

The Defendants seek Summary Dismissal of Plaintiffs' §1983 claim on the basis that the undisputed evidence establishes that James Close, alone, took deliberate, private violence against himself, and there is no evidence that any state actor deliberately sought to deprive him or his parents of any right.

Plaintiffs respond that Defendants' Motion is based on the wrong standard; specifically, that a Plaintiff need not establish that an officer engaged in "deliberate action," but instead must only prove deliberate indifference. Plaintiffs cite a host of cases holding that corrections officers are prohibited under the 14th Amendment from being deliberately indifferent to the serious medical needs of pretrial detainees. *See*, for example, *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Perhaps not surprisingly, it is well established that jailers have a Constitutional duty to protect inmates from suicide. *See*, *e.g.*, *Snow ex*

*rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1268 (11th Cir. 2005); *Cavalieri v. Shepard*, 321 F.3d 616, 623 (7th Cir. 2003); *Coleman v. Parkman*, 349 F.3d 534, 538 (8th Cir. 2003); *Strandberg v. City of Helena*, 791 F.2d 744, 749 (9th Cir. 1986); *Rentz v. Spokane County*, 438 F.Supp.2d 1252, 1265 (E.D.Wash. 2006). As the Plaintiffs argue, it is well established in a broader context that jailers have a duty to protect inmates from a variety of "private action," including violence at the hands of other inmates. *See Farmer*, *supra*.

The issue is instead whether the evidence supports plaintiffs' claim that the individual officer defendants were "deliberately indifferent" to the known risk that James Close would commit suicide. Here, the gist of Defendants' argument is that they "did not believe" that Plaintiff was a suicide risk, based on their own independent analysis (in turn based on their own training and experience) that he was not.

Against this subjective belief is the Plaintiffs' rather substantial evidence that the officers knew or should have known that James was in fact a suicide risk. This evidence includes the prominent "SUICIDE WATCH" notation on the booking form, the fact that James was likely bipolar and depressed, had recently attempted suicide, was subject to wild mood swings and violence (each of which had been observed by officers that very day), was not on medication, was "loopy" and "up and down," and had a "1000 yard stare." The plaintiffs also claim that James Close's mug shot depicts a look "of agony." Despite this evidence, Close was not referred to a Mental Health Professional, or even to a nurse. Officer Gorman later stated that even if he had called one, they "do not answer the phone."

As the Plaintiffs correctly argue, deliberate indifference is a finding that may be inferred from this sort of evidence: "[I]f a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the basis of either his action or his inaction." *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002). "When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer

ORDER
Page - 7

deliberate indifference." *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir.2005). "[D]eliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).

In light of the evidence and the clearly established law, the question is whether the officers' own version of their independent analysis of James Close's mental state is sufficient to establish, as a matter of law, that they were at most negligent, and not deliberately indifferent, to the risk of suicide. There is substantial evidence that James Close was a suicide risk, and the undeniable inference from this evidence is that each of the defendant officers was or should have been aware of that fact. For purposes of summary judgment on the viability of the claim, and for purposes of qualified immunity, the Plaintiffs have met their burden of establishing deliberate indifference to the risk of suicide, and to the deprivation of the Plaintiffs' 14th Amendment liberty interests.

The remaining question is whether the defendant officers were or should have been aware of this clearly established Constitutional right. The defendants largely conflate this issue with their claim that the Ninth Circuit does not or should not recognize a parent's liberty interest in the companionship of an adult child, discussed above. In this Circuit, that interest and that Constitutional right has been clearly established since well before the incident in question.

For these reasons, the Defendants' Motion for Summary Judgment on the Plaintiffs' Constitutional claims against each individual officer must be DENIED.

The Plaintiffs' mirror image Motion, regarding the qualified immunity defense of Officers Correll and Gorman, is effectively Granted. On the substantial record before the Court, the asserted qualified immunity defense is factual and legally insufficient on summary judgment. The jury will, of course, determine whether there was a Constitutional violation. If there was not, these Defendants will prevail. If there was, the individual Defendants will be liable. The jury will not determine whether the

Constitutional right asserted was clearly established, such that a reasonable officer would have known of it. On a qualified immunity inquiry, that issue is one of law for the Court. For the reasons stated, the asserted defense does not entitle the Defendants to summary dismissal on qualified immunity grounds.

**C.    Defendants' state law based immunity claim.**

Defendants also claim that RCW 71.05.120 provides them with immunity for their decisions as to whether or not to commit James Close for mental health reasons.

The statute provides:

> (1) No officer of a public or private agency, nor the superintendent, professional person in charge, his or her professional designee, or attending staff of any such agency, nor any public official performing functions necessary to the administration of this chapter, or peace officer responsible for detaining a person pursuant to this chapter, nor any county designated mental health professional, nor the state a unit of local government or an evaluation and treatment facility shall be civilly or criminally liable for performing duties pursuant to this chapter with regard to the decision of whether to admit, discharge, release, administer antipsychotic mediations, or detain a person for evaluation and treatment: PROVIDED, that such duties were performed in good faith and without gross negligence.

RCW 71.05.120

This defense fails for several reasons. First, the statute relates to decisions regarding involuntary commitment by mental health professionals. It does not relate to officers dealing with pre-trial detainees, and it is questionable whether it applies to police officers in any event. Second, by its terms the statute does not apply where the action (or inaction) in question rises above mere negligence; it specifically excludes decisions based on gross negligence.

Finally, as the Plaintiffs argue, a state statute cannot, as a matter of law, take away a right granted by the United States Constitution. State law immunities cannot bar federal civil rights claims. "Conduct by persons ... which is wrongful under 42 U.S.C. § 1983 ... cannot be immunized by state law." *Pardi v. Kaiser Foundation Hospital,* 389 F.3d 840, 851 (9th Cir. 2004)(citations omitted). A Constitutional claim otherwise made out by a plaintiff cannot be "trumped" by an allegedly exculpatory state statute.

RCW 71.05.120 does not apply.

ORDER
Page - 9

**D.  The County's and the Sheriff's *Monell* Liability.**

The County and its Sheriff, Paul Pastor, seek judgment as a matter of law on plaintiff's Constitutional claim against them. They argue that the Plaintiffs must, and cannot, establish that any Constitutional violation was the result of the County's (or the Sheriff's) policy or practice.

A plaintiff alleging liability of a municipality for civil rights violations must prove three elements: (1) a violation of his/her constitutional rights, (2) the existence of a municipal policy or custom of the municipality, and (3) a causal nexus between the policy or custom and the constitutional violation. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978). The first element is discussed above, and is established for purposes of this analysis.

There are three ways to show a policy or custom of a municipality: (1) by showing "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (internal citations omitted).

Plaintiffs argue that the Pierce County jail has for years been under an Order of this Court regarding the Constitutional sufficiency of its health care, including mental health. Based on this, they argue that the policies advanced by the Defendants as adequate, are in fact inadequate as a matter of law.

They also submit opinion testimony from Lindsey Hayes, an expert on jail suicides. She has reviewed all of the information about James Close's booking (including the "SUICIDE WATCH" notation and numerous acknowledgment that he had mental health issues) as well as the Interim Reports issued over time in the *Herrera* litigation. [Dkt.. #60] She opines that through inadequate intake screening policies and the failure to conduct regular suicide prevention training to correctional staff, the

County allowed its correctional officers to inconsistently react to information regarding potentially suicidal inmates. It is her expert opinion that these failures led to James Close's suicide.

This evidence of the inadequacy of the County's training is further supported by evidence from the officers themselves. Officer Gorman admitted that he did not in fact have formal training in how to probe for suicide dangers, and described his training in mental health issues as "half-assed" and "not much." [See Dkt. #61, Ex. V at 58:15-23; Dkt. #32, Ex. O at 6.]

On this record, it cannot be said as a matter of law that the County's "policies" did not lead to the Constitutional violation discussed above. For this reason, the County's Motion for Summary Judgment on its *Monell* liability is DENIED. Plaintiffs request for a continuance of the Motion under Rule 56(f) so that discovery into the County's policies may be conducted prior to a ruling is therefore DENIED as moot. This Order should not be construed as a limitation on further discovery into those policies.

Plaintiffs also seek a delay in the ruling on the claims against Sheriff Pastor individually, at least until his deposition is complete. The evidence (and therefore the briefing) on the Sheriff's potential liability is incomplete. This Request is therefore GRANTED. The Plaintiffs shall be permitted to conduct the Sheriff's deposition prior to a ruling. Following that deposition, the parties may each file one five page Memorandum related specifically to the issue of the Sheriff's potential liability. Those Briefs shall be exchanged simultaneously, on December 18, 2009.

**CONCLUSION**.

Viewed in the light most favorable to them, the evidence does support the Plaintiffs' claim of a clearly established Constitutional violation, and one which reasonable officers in the Defendants' position would have known. The Individual Defendants' Motion [Dkt. #40] on the basis that there was no Constitutional violation as a matter of law, or that the officers are nevertheless entitled to qualified immunity because they could not have known their conduct was a violation, is DENIED.

Plaintiffs' Motion [Dkt. #31] seeking dismissal of the qualified immunity defense as applied to Officers Gorman and Correll is effectively GRANTED. The County's Motion for Summary Judgment under *Monell* [Dkt. # 41] is DENIED. Finally, the evidence is insufficiently developed to rule as a matter of law whether Sheriff Pastor may be liable under *Monell*. For this reason, the Plaintiffs' Rule 56(f) Motion to delay the ruling on that portion of the case until further discovery is completed is GRANTED, and that limited portion of the Defendants' Motion will be re-noted for December 18, 2009. Any briefs on this topic shall not exceed five pages and shall be filed and served on the noting date.

IT IS SO ORDERED.

Dated this 17th day of November, 2009.

_____
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE